· Gann vs. Varnado.

## No. 12,991.

## J. M. GANN VS. I. N. VARNADO.

### SYLLABUS.

Two country merchants engaged in business in the same vicinity, having both furnished plantation supplies to a customer who made an insufficiency of cotton to pay their accounts, and one of them, having obtained possession thereof by purchase, in an honest competition, was caused to be arrested by the other on a charge of robbery, and to be incarcerated in jail. and there detained for several days, being fully aware of all the circumstances. HELD : That the proceeding was taken without probable cause, and with malice inferable from the act, and the affiant is liable in damages to the party thus arrested, as having been guilty of a malicious prosecution.

ON APPEAL from the Sixteenth Judicial District Court for the Parish of Washington. *Reid, J.*

*Clay Elliott* for Plaintiff and Appellant.

*P. B. Carter* and *O. P. Amacker* for Defendant and Appellee.

Submitted on briefs January 11, 1899.
Opinion handed down February 6, 1899.
Rehearing refused February 20, 1899.

The opinion of the court was delivered by

WATKINS, J. This is an action in damages for a malicious prosecution, founded on the following state of facts as related in the plaintiff's petition—plaintiff's claim being for ten thousand dollars.

That on or about September 24th, 1895, Varnado made an affidavit before the Justice of the Peace of Washington parish, wherein both parties resided, charging petitioner with robbery, by maliciously and forcibly taking and carrying away one bale of cotton, which he, Varnado, pretended to belong to him; and he caused a warrant to issue thereunder for his arrest, and whereunder he was arrested, and carried to the parish jail, where he was kept in custody by the sheriff, until

September 28th, 1895, when he was released on bond of $500.00 for his appearance in court to answer said charge.

That at the next jury term of the court, a grand jury was regularly impanelled, and said charge against petitioner was investigated by them, and they failed to find a true bill, whereupon, he was discharged from his bond, by order of the court; and the prosecution against him was abandoned by Varnado.

Petitioner shows, that he has a family dependent upon him for support and protection; that he has, also, been an honest and upright citizen, and has deservedly attained the good opinion, esteem and respect of his neighbors in the community in which he lives, and of good citizens of the parish and State, and a reputation among his said neighbors as an upright citizen and business man; all of which has been ruined by his prosecution on the charge of robbery, and incarceration in jail therefor.

Plaintiff avers, that he was not guilty of the charge made against him; that the said affidavit is and was false and untrue, and inspired and made by the said Varnado by malice, and without probable cause, and with no object in view other than to injure the good name, social and business standing and reputation of the petitioner, and humiliate and lower him in the estimation of his neighbors, and other citizens of the State.

He avers, that he was arrested at his store in the presence of his clerks and customers, from thence he was taken to jail by the sheriff, and deprived of his liberty for three days.

He further avers, that at the term of court following the making of these charges, he was forced to leave his family and business, and remain at court more than a week in order to comply with the, law, and meet this charge.

That these proceedings were very mortifying and humiliating to petitioner, and have resulted in great damage, annoyance and injury to him in his business, and for all of which the defendant is responsible in damages.

That defendant is a wealthy man, and a prosperous merchant, and resides in the immediate vicinity of petitioner; and that he has sustained at defendant's hands, damages in the sum of ten thousand dollars, which are itemized as follows, to-wit:

Fee paid to attorney for legal services in drawing up application for bail...................................$   20 00

| | |
|---|---:|
| Loss of time and expense while under arrest............. | 50 00 |
| Loss of time and expense attending court............... | 300 00 |
| Injury to business caused by these proceedings.......... | 2,000 00 |
| For mortification and humiliation as suffered and endured, and for the injury to, and loss of his good name, social standing and character as above said................. | 7,880 00 |
| Aggregating in all................................. | $10,000 00 |

His prayer conforms to the foregoing averments.

The following is the purport of the defendant's answer, viz.:

That he denies each and every allegation in the plaintiff's petition, except what is especially admitted. Defendant admits that he made an affidavit before W. A. Burris, justice of the peace, wherein he, from and upon information received, charged plaintiff with robbery of a certain bale of cotton, from the custody of one Walker, said cotton being the property of I. N. Varnado & Son. That a warrant was issued by said justice, and the plaintiff was thereunder nominally arrested, but, respondent avers, that in making said affidavit, he had probable cause and reasonable grounds for believing the plaintiff guilty as charged.

He especially denies that he was actuated by malice, and avers, that he acted under the instruction and advice of an attorney-at-law, and of the justice of the peace, in making the affidavit. That plaintiff admitted taking the cotton branded in defendant's firm name, and declared to a deputy sheriff that he had carried the cotton out of the State; that in a civil action, involving the ownership of said cotton, entitled I. N. Varnado & Son vs. J. M. Gann, the plaintiff was decreed to be the owner of said cotton.

He further avers, that while under arrest, the plaintiff Gann, was not subjected to any humiliation, annoyance or harassment, but, on the contrary, was allowed the liberty of the town, and was treated with every consideration.

He further denies that the character, reputation or credit of plaintiff has been in any way injured by the action of this respondent, and avers that plaintiff's demand is unjust, unreasonable, and without warrant or justification, either in law or equity; and he prays that the same may be rejected.

On the issues thus joined, a trial was had before a jury, who ren-

dered a verdict in favor of the plaintiff, for the sum of five hundred dollars.

Upon the defendant's suggesting that the verdict of the jury was contrary to law and evidence, the judge *a quo* set the same aside, and granted a new trial. Upon the second trial, the cause was submitted upon the same testimony, with the exception of the solitary statement which is made by P. B. Carter, one of the attorneys for defendant, who was introduced as a witness for the plaintiff, to the effect: That he was present at the court during the progress of the first trial, but obtained permission of the judge to be absent from the court one day on which this case was on trial, on account of sickness in his family; but that he was present during the remainder of the week while the trial was in progress.

That, at the subsequent term of court, plaintiff's counsel asked permission to withdraw his prayer for trial by jury, and leave granted to have the case tried before the court, which application was refused by the judge.

That, subsequently, the case came on for trial, and same resulted in a verdict in favor of the defendant, rejecting the claims of the plaintiff; and from that verdict, and the judgment thereon based, the latter prosecutes this appeal.

The following is the purport of the testimony which was adduced on the trial, viz.:

The first witness plaintiff introduced was the justice of the peace before whom the defendant, Varnado, made the affidavit on the 24th of September, 1895, charging the plaintiff, Gann, with the crime of robbery in taking from Walker's gin a bale of cotton he claimed as his; and he gave full and complete details of said transaction—stating that he subsequently sent all the papers before the next grand jury for investigation.

Next in order was the deputy sheriff who arrested Gann under a warrant for the crime of robbery, and he gave the particulars of his arrest, incarceration in jail, and detention therein for three or four days.

Then the clerk of the court was introduced, and testified that the affidavit Varnado made, and the bond which Gann had given, were turned over to the Grand Jury; and that they found no true bill, and that Gann's bond was subsequently cancelled.

The statement of Gann, the plaintiff, was, that he has resided in this

State for three years, and had therefore resided in Poplarville, Mississippi, and had been engaged in merchandise there, and at Cedar Grove, in Louisiana, for about fifteen years; and that he had, during his residence in Louisiana, been engaged in merchandise at Shady Grove.

That during the last three years Varnado has also been engaged in merchandise about two miles distant from Shady Grove, and was well known to him.

He relates the transactions which led up to his arrest and false imprisonment, in substance as follows, viz.:

That about the 19th of September, 1895, J. R. Rimes came to his store and sold him a bale of cotton, and in the evening late, he sent his wagon to Walker's gin and had it hauled to his house. That he accompanied the wagon, and so did Rimes; and it was put on his wagon by Rimes and the driver, in the presence of Walker and his two sons.

That the deputy sheriff was sent for it on the following day, and he requested him to point out the cotton; but that he refused to do so—stating, "if you can find it, go and get it."

That he went away without making any seizure, but returned a few days afterwards with the warrant for his arrest.

That he was arrested in his store, in the presence of his clerks and customers; and remained in custody while many other persons who were attracted by curiosity, came in.

That he was taken by the sheriff, openly and publicly, to the town of Franklinton, the parish site, and incarcerated in jail, and kept there until he furnished bail—some three or four days.

That Rimes was indebted to him for supplies, and that he paid him by crediting his account.

That Walker's gin is about three-quarters of a mile from plaintiff's store, and one and a half mile from that of Varnado's store.

That he employed no force or duress in getting possession of the cotton; and at the time had no notice of Varnado's claim other than the statement of Walker that Varnado had directed him to mark the cotton, but that Rimes denied Varnado's right to do so, and told him to put it on his wagon.

He stated to Walker that he had sold the cotton to him, and helped the driver put it on the wagon.

The following interrogation then occurred, viz.:

"Q.—Did you have any idea, or intention whatever of committing any robbery?

"A.—Why, certainly not. I never thought of such a thing. For Mr. Rimes sold it to me and I considered it my cotton. He sold it to me, and I thought I had a right to it."

He states that he had made advances on the cotton. That at the time of his arrest, he carried a stock of $4,000 or $5,000, and owned, in addition, a farm of 600 or 700 acres; and the movables on the farm were worth $5,000.

He makes a statement of the damages he sustained, giving full particulars, and which amount in the aggregate, to the sum demanded; and among them are enumerated, injury to his social and business reputation, his credit, and financial standing as a merchant; and, also, his annoyance, vexation, humiliation and mortification on account of his arrest under so grave and heinous a charge as that of robbery, and being confined in jail for several days.

He states that Rimes, his customer, only lives about one-half a mile from Walker's gin.

That at the time the bale of cotton was delivered to him by Rimes after his purchase, it was branded with a (V), and that Walker told him that he had been instructed by Varnado to place that mark upon it; and that he afterwards put his own mark on it, and marked out or erased the (V).

That this same bale of cotton was the subject of a civil suit between him and Varnado, and the court decided that it belonged to Varnado.

J. R. Rimes states emphatically, that he never sold the bale of cotton to Varnado, but that, on the contrary, he sold it to Gann, the plaintiff, and delivered it to him in the presence of W. F. Walker and his two sons.

His statement of what occurred immediately previous to the sale to Gann is as follows, viz.:

"When I hauled the cotton that morning to the gin of Mr. Walker, Mr. Varnado came up and stayed there until I got through unloading. And after we got through unloading, his son, Scott Walker, brought a sample of the cotton and showed it to Mr. Varnado. He took it and asked me what was I going to do with it. I told him I was going to sell it; and he asked me to whom. I said, I am going to give you and Mr. Gann both a chance on it. I first intended to carry it out to Mr. Gann, and then out to your house; and the one who offered me the

most (should have it). He said, 'I want this cotton.' 'Allright,' I said, 'if you give me more for it than Mr. Gann, you can get it.' 'By G—d, I must have it,' he said. 'You are fixing to get yourself in a scrape.' I asked him why; I don't see why I am going to get that way. He said, 'I want to tell you right now, if I don't get this cotton, I am going to make it cost more than it is worth. Mr. Gann has been monkeying with my business long enough, and if I don't get this cotton, I am going to make it cost more than its worth. He said: 'I will tell you what I will do; if you will stick to me and do what I tell you, *we will beat Mr. Gann out of every cent you owe him, and it shant cost you a nickle.*' I said, 'Mr. Varnado, I intend to pay you and Mr. Gann every cent I owe you. I never bore the name of not paying an honest debt.' And he said: 'By G—d, you had better do what I tell you'; and I replied, 'If that is what you want me to do, you have struck the wrong man.' 'Well,' he said, 'I will give you seven and a-half cents for that cotton, and you had better take it;' and I told him I would not, until I saw Mr. Gann."

He then told him, if Mr. Gann did not give him more than that, he could have the cotton. He then most distinctly corroborates the statement of Gann with regard to the circumstances of the sale and delivery to him of the bale of cotton.

The story of Gann and Rimes is fully confirmed by the three Walkers and two other witnesses.

The purport of the defendant's testimony is as follows, viz.:

Charles Richardson states that he was deputy sheriff and had in hand a writ against Rimes for the seizure of the bale of cotton claimed by Varnado, and that on calling on Gann for it, the latter said: "As far as the cotton is concerned, it is out of the State."

That he reported this statement to Varnado before he made the affidavit charging Gann with robbery.

That while he was, at the time, deputy sheriff, he was under contract with Varnado to begin work for him as clerk in his store on the following Monday.

Steve Burris said, Rimes told him that he had sold the cotton to Gann.

"Q.—Did you see John Rimes at his house on the day of the seizure, etc.?

"A.—Yes, sir.

"Q.—Did you see him on Saturday following the transaction?

"A.—Yes, sir, I did.

"Q.—Did you have a conversation with him, etc.?

"A.—Well, Mr. Rimes called there at the store for his mail, and I .told him to come in; and as he came in, I said to him, 'I suppose you have sold Gann the cotton?' (and he replied) 'Yes, sir, I did it to save myself. Gann wanted to see me and break me up, if he didn't get the .cotton.

"Q.—Did he say whether he had sold it to Varnado?

"A.—I didn't ask the question. `It was understood between me and Mr. Varnado that he had bought the cotton."

This witness states that he informed Varnado of Burris' statement before the issuance of the warrant for Gann's arrest.

Lucien McMillen makes a similar statement, and says that Rimes .told him that he begged Gann to give him a few days' time so that he might see Varnado concerning the cotton, but that he refused—saying, that he "had to have the cotton." That Rimes then said to Gann that he would go with him to the gin, "if he had to have it."

"Q.—What did he say to go to the gin for?

"A.—To let him have the cotton."

That witness was a clerk of Varnado.

The foregoing is a fair synopsis of the testimony of all the witnesses except that of the defendant; and the substance of it is, that Rimes was a customer at the stores of both the plaintiff and the defendant, and had an account with each for supplies furnished, but not a ·sufficiency of cotton to pay both. That the two stores were less than two miles apart, and Rimes lived in their immediate vicinity; and that Walker's gin was quite near to Gann's store. That Rimes hauled his cotton in the seed to the gin, and at that time the rivalry between the two merchants commenced.

Varnado as a witness says that he "bought the bale of cotton from Mr. Rimes, with the understanding that when it went into a bale, and was weighed by Walker, he was to take it by the gin weights."

Consequently, the delivery was subject to this condition which had not yet transpired; and there is no proof that Rimes was present, or ·assented thereto.

On the contrary, all the testimony, other than that of Varnado is to the effect that he was not present and did not assent thereto.

Therefore, the marking of the bale with the brand of I. N. Varnado & Son was without any significance and afforded no indicia of title

in that firm; and presented no obstacle to a sale by Rimes to the plaintiff Gann.   The proof is clear, that Rimes accompanied Gann to Walker's gin, and when Walker called their attention to the fact of the bale having been marked in Varnado's name, Rimes at once repudiated his right to do so, in the presence of Gann, the three Walker's and the wagon-driver; and he volunteered to assist the driver to put the cotton on his wagon.

And the statement of the deputy sheriff, Richardson, is, viz.:   "I did not ask Rimes whether he had sold the cotton to Varnado.   *It was understood between me and Mr. Varnado, that he had bought the cotton,*" possesses powerful significance in the light of the surrounding circumstances.

Not only does this testimony cast a serious doubt upon the claim of Varnado as owner of the cotton, but it makes it perfectly clear that Varnado was fully advised of the dealings between Rimes and Gann with regard to this bale of cotton *prior* to his making the affidavit charging Gann with robbery; for it was this deputy sheriff who had gone to Gann's store on the day following his purchase, with a writ of attachment, at Varnado's instance, and he therefore knew it was in Gann's possession.

It is quite true that in a civil suit between I. N. Varnado & Son and Gann, the court decided that the former were owners, but it does not appear on what evidence their claim was sustained; yet, in so far as the question of ownership in Varnado goes to substantiate the charge of robbery, the decided preponderance thereof is just the other way.

It tends not only to show that Gann had bought the bale of cotton lawfully from Rimes, and had obtained *actual* possession thereof, at least three days prior to the making of the affidavit for his arrest by Varnado; and that the latter knew the facts and circumstances of Gann's purchase and possession at the time he made the affidavit.

In this connection, the testimony of Varnado may be appropriately considered, and we have made the following extracts from the transcript, as they are quoted in the brief of plaintiff's counsel after having compared and verified same, viz.:

"Mr. Varnado in his direct examination says:

"Q.—When did you first learn that the cotton was not carried to your store, but to some other point?   From what source?

"A.—I learned it from Burris (means Steve Burris), the man in

charge out there. A negro boy called me out about 8 o'clock in the morning and said he had a note from Burris; I looked at it and went and woke Mr. Burris up.

"Q.—What Burris?

"A.—Judge Burris (means W. A. Burris, the J. P. at Franklinton), and got papers to sequester the cotton.

"Q.—Well, do you know who was armed with that writ and execution?

"A.—Chess Richardson.

"Q.—Was any report made subsequent to that time to you by Chess Richardson as to what occurred between him and Gann?

"A.—Yes, sir. When he returned and failed to find the cotton, Gann told him that it was out of the State, and if I got the cotton I would have to make it out of him, and I then made a statement to Carter about the news Richardson brought me and what the result of the trip was out there and he advised me to arrest Gann.

"Q.—Who was present when he so advised?

"A.—Judge Burris.

"Q.—Now, Mr. Varnado, when you made the statement to Carter, state whether or not you made a full statement from the beginning to the end?

"A.—I made it just as clearly as I knew how to make it and all the statement Richardson made to me, and the whole thing.

"Q.—State what you were governed by in filing this affidavit in swearing out this warrant, whether it was advice of counsel, or Burris, or what?

"A.—*Partly* by that and *partly by circumstances and statements* of Richardson.

"Q.—Did you entertain any malice in filing that affidavit?

"A.—None whatever; I had the same feeling against him in that as any one else that had taken my cotton.

CROSS-EXAMINATION.

"Q.—Mr. Varnado, you had no malice and hatred against Mr. Gann at the time of making this affidavit?

"A.—Just as much as any one else that would take a bale of my cotton.

"Q.—There was nothing between you before that?

"A.—Any other than I wouldn't have the best kind of feeling for any one that had my cotton, and from *information I believed* it belonged to me.

"Q.—How did you believe that he had got the cotton?

"A.—I thought that he had went to the mill, hauled·it off without leave.

"Q.—What you believe, who told you that?

"A.—By a letter received from Mr. Burris (Steve Burris).

"Q.—What was the substance of the letter he wrote you?

"A.—That Mr. Gann had went to the mill and taken a bale of cotton I had bought from Rimes when I left the mill. When I bought the ·cotton, I told him that I bought the cotton and came on home and instructed him that Walker would send it up Saturday, and when I got home I gets a letter stating that Gann had carried the cotton off.

"Q.—Why didn't you make that affidavit as soon as you received that letter from Burris?

"A.—I didn't have time; I first tried to get the cotton; I thought I would get the cotton in the State, I didn't think it was out of the State at the time.

"Q.—Why didn't you? You say that you thought that Gann took it off without leave or license when the sheriff was over there?

"A.—I supposed that when I sent the sheriff there first and he would take the cotton and we would have a civil suit, and when the sheriff returned and said that the cotton had gone out of the State, and my attorney said it was robbery, I taken it out.

"Q.—Why didn't you sue for the probable value of a bale of cotton?

"A.—I acted under the advice of my attorney.

"Q.—Did you consult an attorney at the time you got out a writ of sequestration?

"A.—Yes, sir.

"Q.—Which one?

"A.—Mr. Carter.

"Q.—*How came you not to make the affidavit then?*

"A.—*I just stated that I hoped to catch the cotton in the State, When I failed to find it, I issued the writ.*

"Q.—So, you made the affidavit upon the information of Richard-son?

"A.—Yes, sir; and upon the advice of Mr. Carter.

"Q.—What explanation did you make to Carter at the time you. made the affidavit? What did you tell him?

"A.—I told him that I had been—I told him this first; I didn't tell all at one time; I made two statements. I made a statement when I got out the papers in the civil suit, and he was aware of what had occurred, and at the time of getting the letter from Burris, and then when Richardson returned. I believe Mr. Carter came to me and asked the result, and I told him that I failed to get the cotton, and. what Richardson had stated that Gann said to him.

"Q.—And then you made the affidavit?

"A.—Yes, sir.

"Q.—Well, how is it that you told him (Walker) when you left the gin that if anybody else came for it, not to let them have it?

"A.—*Because* Gann came out here and *recorded a lien* against Rimes, and I notified Rimes that I had a claim on the cotton, and warned Gann not to advance anything on that crop; and also got the clerk of court to write Gann and state to him that I had a bill against him, and *also made out my account that day and recorded it in the clerk's office.* I stated that I expected to give. I warned him that I claimed that I had furnished supplies to make that crop and that I expected to hold that crop.

"Q.—And because he got a bale of cotton you made an affidavit?

"A.—No; *because he run it out of the State. I attempted at first to get* it by civil action.

"Q.—Then did you, at the time you left word with Walker, half way expect that Mr. Gann would come after the cotton?

"A.—I sorter half way expected they would attach the cotton and I left it there till Saturday, *not particularly for that,* but that was the nearest way to get it away from there without extra labor."

Again:

"Q.—After you made the affidavit, did you go before the grand jury and testify against Gann?

"A.—I was summoned before the grand jury and while there I was questioned concerning Gann and Rimes, and that cotton.

"Q.—Did you not have other witnesses summoned before the grand jury concerning the charges made?

"A.—I think I did. Yes, sir.

"Q.—Do you know if the grand jury acted in the matter—found any bill against him? I mean as far as Gann is concerned.

"A.—I don't know further than I stated.

"Q.—Mr. Varnado, where do you live, now?

"A.—Osyka, Mississippi.

"Q.—How came you to move away from this State?

"A.—Well, there are so many reasons. I don't know how to go at it exactly, etc."

It is manifest that Varnado's testimony does not materially alter the status of affairs as it is fixed by other witnesses.

It is quite clear that Gann had a valid and duly recorded lien against the crop of Rimes, of which Varnado was duly advised, and against which he protested; and that soon after having obtained this information the latter proceeded to have his own claim recorded.

The testimony tends to show that this state of affairs produced in the mind of Varnado a spirit of strong business rivalry; and when Rimes hauled the seed cotton to Walker's gin, and he was informed of his intention to permit both merchants to bid on the same when ginned and baled, and to allow the one offering the highest price to take it, Varnado manifested great anger, and told Rimes that he *"must have it,"* accompanying the statement with an oath. That he told Riems that he "was fixing to get himself in a scrape;" and that he was going "to make it cost more than it was worth" if he didn't get the bale of cotton.

That he declared that "Mr. Gann has been monkeying with his business long enough, and that if he did not get this cotton, he was going to make it cost more than its worth."

That he then proposed to Rimes that if he would stick to him (Varnado), and do what he told him, "we will beat Gann out of every cent (he, Rimes) owed him, and it should not cost him a nickle."

That this proposition Rimes refused, and thereupon the latter replied with an oath:

"You had better do what I tell you."

These statements were made and emphasized by Rimes in the course of his testimony for the plaintiff in chief, and were not denied or disavowed by Varnado when interrogated as a witness in his own behalf.

Failing to obtain Rimes' consent to his offer, Varnado gave Walker directions to put the mark of his firm, I. N. Varnado & Son, on the bale when it had been packed, and if any one came for it not to let him have it.

He instituted an attachment suit against Gann, and failing to find

the bale of cotton, he made the affidavit for his arrest on a charge of robbery.

But Gann made a purchase of the cotton from Rimes, and the latter placed him in actual possession of it, at Walker's gin in the presence of several persons at least three days prior to the affidavit being made, and of which Varnado had full notice.

There is a total absence of proof of any secrecy, or stealth on the part of Gann in the transaction; and none whatever of his having used any force or violence in getting possession of the cotton.

The dealings of Gann in respect to the cotton were open, public and of a business like character, and in pursuance of his legal rights; and his arrest and confinement in jail upon a charge of robbery was entirely causeless and unjustified, in any view, that can be possibly taken of the case.

And the contention of Varnado's counsel that he acted upon the advice of counsel is not sustained by the proof. The only witness who testified on the trial in reference to this question was Varnado himself; and when other witnesses were questioned on the subject, his counsel objected, and his objections were sustained.

The attorney who represented and advised Varnado in the civil suit, and counseled him to make a charge of robbery against Gann, was his sole counsel at the trial, and prepared and signed his answer; and the plea of counsel's advice is made conspicuous by the fact that he failed to give the court the benefit of his testimony on the subject.

This fact was specially pointed at the second trial by plaintiff's counsel having called him as a witness for the purpose of affording him an opportunity of making a statement; but this he declined to do.

Indeed, we think, Varnado's testimony on this question is conclusively against him, as will appear from the following, viz.:

"Q.—State what you were governed by in filing this affidavit, and swearing out this warrant, *whether it* was advice of counsel, or Burris, or what?

"A.—*Partly* that, and *partly* by *circumstances* and *statements* of Richardson."

It is difficult for a court of justice to believe that an attorney-at-law who had been fully informed of the facts surrounding the cotton transaction, could have advised Varnado that he was justified in making a charge of robbery against Gann.

The district judge prepared and submitted to the jury, a written

charge, with which he seems to have taken great pains, and it evidenced a close research into the authorities.

Therefrom, we make the following extracts:

(a) "That probable cause means a reasonable ground of suspicion supported by circumstances in themselves sufficiently strong to warrant a reasonable, cautious man in the belief that the person accused, is guilty of the offense charged."

(b) "That to sustain the charge of malice, the criminal charge must appear by a preponderance of the evidence, to have been wilfully false."

(c) "That to sustain a suit for a malicious prosecution, the facts ought, to be such as to satisfy any unprejudiced mind, that the accused had no ground for the prosecution, except his desire to injure the accused."

(d) "That the commencement of a criminal prosecution, simply for the purpose of collecting a debt, or private claim, is an abuse of the process of court, and would be *conclusive evidence* of malice on the part of the person commencing such proceedings; and in such case, the advice of counsel would afford no protection."

(e) "If you believe from the evidence, that when the defendant made complaint before the justice, he did not have probable cause to believe that such complaint was true, then, you may infer malice, and express malice need not be proved."

Our learned brother of the district court entertained a proper appreciation of the law applicable to malicious prosecution, and instructed the jury with care; and this is apparent from the foregoing extracts from his charge.

An examination of all the authorities makes it plain that, under the evidence adduced, the defendant made the affidavit against the plaintiff and caused his arrest and confinement wholly without probable cause.

"To maintain an action, the plaintiff must prove (1) that he has been prosecuted by the defendant criminally or in a civil suit, and that it is at an end; (2) that it was instituted maliciously and without probable cause; (3) that he has sustained damage thereby. 2 Greenleaf on Evidence (10th Ed.), Sec. 453.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Probable cause does not depend on the actual state of the case in point of fact, but upon honest and reasonable belief of the party pros-

ecuting. It must appear that the defendant knew of the existence of these facts which tended to show reasonable and probable cause, because without knowing them, he could not act upon them; and, also, that he believed that the facts amounted to the offense which he charged, because otherwise, he will have made them the pretext of prosecution without even entertaining the opinion that he had the right to prosecute." *Id.* Section 455.

The Supreme Court in an early case defined probable cause as being "the existence of such facts and circumstances as would excite the belief in a reasonable mind, acting on the facts within the knowledge of the prosecutor that the person charged was guilty of the crime for which he was prosecuted." Wheeler vs. Nesbitt, 24 Howard, 544.

And, in the same case, the court stated the want of probable cause, thus:

"Undoubtedly, every person who puts the criminal law in force maliciously, and without any reasonable and probable cause, commits a wrongful act; and if the accused is thereby prejudiced, either in his person or property, the injury and loss so sustained constitute the proper foundation of an action to recover compensation."

And, in furtherance of that view, the court referred to the following instruction which had been given in the lower court to the jury, as follows, to-wit:

"If, however, the jury find that the arrest was wanton and reckless, and that no circumstances existed to induce a reasonable, dispassionate man to believe, that the defendant was guilty of having stolen the horses he had in his possession, then the jury are to infer malice."

With reference to this charge the court say:

"Clearly this part of the charge must be taken in connection with what preceded it, and when so read and understood, it is impossible to hold it is incorrect, etc."

In Behrnes vs. Coxe, 2nd An., 472, the averment of the plaintiff was, that "the defendant maliciously intended to injure him, and without reasonable or probable cause, charged him on oath before a justice of the peace, with having stolen a negro girl slave named Maria, and caused him to be arrested and taken before a justice of the peace, by whom he was discharged."

The proof showed that while a public sale was about being made of the property of a succession of which the slave Maria formed a part, "she voluntarily left, or was removed from the possession of the defend-

23

ant, and went to the plantation of the plaintiff's father, and where the plaintiff resided, but through whose agency is not distinctly shown. The defendant thereupon made the oath before the justice of the peace * * * that the slave was stolen and taken away from his premises by the plaintiff."

The plaintiff demanded five thousand dollars damages, and the jury awarded five hundred dollars; and the verdict and judgment were affirmed on appeal.

But the plaintiff in that case was not put in jail and confined therein as Gann was; and he was afforded a preliminary examination and speedy release as Gann was not. And the defendant in that case was in *possession* of the property as Varnado was not; and the charge preferred against Gann was far more ignominous and the circumstances against him altogether free from doubt.

In Cannell vs. Michel, 6 Ann., 579, the proof showed that the plaintiff had agreed to build a cistern for the defendant, on whom he was to receive an order for payment. That the order was drawn and dishonored, and the plaintiff took down and carried away the cistern, and the defendant made an affidavit against him, charging him with larceny, from which he was subsequently discharged on a preliminary examination by the justice of the peace.

The court say: "There was nothing in the conduct of the plaintiff which indicated the felonious intention with which he is charged. The defendant saw and knew, that the plaintiff claimed the cistern as his own property, and as a matter of right until it was paid for.

*       *       *       *       *       *       *       *       *       *       *       *

"If the defendant really believed he had any claim to the cistern, he could as easily have sued for and sequestered it, as to have caused the arrest of the plaintiff for a larceny, of which the case did not present a single feature. The use of criminal process to enforce a civil claim, is an intolerable abuse, even when the claim exists. But, if the claim is unfounded, it shows a recklessness of the rights and character of others which amounts to malice."

The jury awarded the plaintiff damages and this court sustained their verdict.

The instant case is an almost exactly parallel case to the one there decided.

Both the plaintiff and defendant in Decoux vs. Lieux, 33 Ann., 392,

were country merchants, each of whom had advanced their customer, Patin, plantation supplies.

The defendant sued Patin had sequestered his crop ungathered in the field, and the defendant enjoined the seizure; and, as a result of those proceedings, the crop of cotton was released from seizure.

"Patin, thereupon," say the court, "proceeded with the gathering of his crop, hauled a part of it publicly, and in the day time, to a public gin in the neighborhood, where one bale was ginned and baled and delivered to the plaintiff, Decoux, as agent for his wife, who, also, publicly and in day time, had it hauled to his wife's store and deposited in the yard. There seems to have been not the slightest attempt at concealment about any of those proceedings."

Thereupon, the defendant made an affidavit before the parish judge, charging the plaintiff with having stolen the cotton; and, thereunder a warrant was issued, the plaintiff arrested, and carried to the courthouse where, without examination, he was released on giving bond to appear before the District Court. At the session of that court, the case was examined by the grand jury, who returned "not a true bill," whereupon he was discharged by the court, and his bond cancelled.

On this state of facts the court made the following observations, viz. ·

"It is ·manifest that, under the facts disclosed, Decoux had committed no crime whatever. The cotton belonged to Patin. * * * He had the perfect right to control and dispose of the cotton. * * * Lieux seems to have had no cause for believing Decoux guilty' of the crime with which he charged him, except the bare fact that he was in possession of the bale of cotton. The very publicity of that possession and the absence of concealment were badges of innocence which should have put him on enquiry. The slightest inquiry would have developed the truth. * * *

"It is difficult to conceive of a case more completely lacking in either actual or probable cause. His conduct was rash, reckless and unreasonable, evincing utter absence of that caution and inquiry a man should employ before making criminal charges against his neighbor. The reputation and liberty of the citizen are privileges too precious to be left at the mercy of such grossly inconsiderate proceedings as these."

The jury awarded the plaintiff one hundred and fifty dollars, and this court increased that allowance to five hundred dollars.

We have made liberal extracts from the opinion in that case, because we conceive the facts therein detailed to be so perfectly apposite to the facts of the instant case, that the decision of the court therein, must exercise a controlling influence over our opinion in this case.

Not only so, but the court held, that the advice of counsel given to the defendant, on the state of facts as represented, was so "utterly unfounded," that it was "not entitled to any consideration whatever."

The same proposition is very plainly stated by the court in Classcock vs. Bridges, 15th Ann., 672, thus:

"The defendant for the purpose of obtaining possession of the boat, caused the plaintiff to be arrested, etc.   *   *   *

"It is very evident that the only object of the defendant was to obtain possession of the boat, and that he acted without probable cause in the matter of the arrest.

"Under such circumstances, the advice of counsel, as contended, will not exempt the defendant from liability for damages to the plaintiff, who has been aggrieved by his act."

Grundy vs. Crescent News and Hotel Company, 38th Ann., 976, and Cointcmont vs. Cropper, 41st Ann., 303, are parallel cases.

Authorities of similar import might be cited *ad infinitum,* but we have chosen the foregoing as amongst the most conclusive, and rest our decision upon them

After having given this case most careful attention in all of its details, we feel thoroughly satisfied the defendant made the affidavit for the arrest of the plaintiff on the very grave charge of robbery, and caused him to be arrested and incarcerated in jail, where he was detained for three or four days, wholly without probable cause, and with malice, both express and implied.

The said arrest was made publicly, in the plaintiff's own store, in the presence of his clerks and customers, and in the near vicinity of his own family and residence.

The circumstances under which his causeless arrest and incarceration in jail occurred, were most aggravated and humiliating to the plaintiff; and we are entirely confident that the verdict of the jury has not done him justice.

Exercising the prerogative vested in this court, though it has been exercised in but few instances and under exceptional circumstances, our conclusion is to set aside the judgment and verdict appealed from

.and render a judgment in favor of the plaintiff in the sum of five hundred dollars.

It is therefore ordered and decreed that the verdict and judgment appealed from be annulled and reversed; and it is now ordered and decreed that the plaintiff do have and recover of and from the defend-ant the sum of five hundred ($500.00) dollars, and that he be taxed with all costs of both courts.